# IN THE UNITED STATES DISTRICT COURT
# DISTRICT OF KANSAS

Wayne Schwartz et al.,

      Plaintiffs,

v.                                                Case No. 12-1375-JWL

Atlas KS Energy, LLC, et al.,

      Defendants.

## MEMORANDUM & ORDER

In 2005, plaintiffs executed oil-and-gas leases totaling approximately 240 acres in Kingman County, Kansas to defendants. The land covered by the leases is known collectively as the "Depenbusch Gas Unit" and a natural gas well was drilled and completed on the Depenbusch Gas Unit in December 2005. The leases contain habendum clauses providing for a primary term of 3 years "and as long thereafter as oil, gas . . . is or can be produced." In 2012, plaintiffs filed a petition in state court seeking a determination that the leases had terminated by their own terms for lack of commercial production. Plaintiffs also set forth claims for trespass on land, breach of contract and conversion based on defendants' continued gas production activities.

Thereafter, defendants removed the action to this court on the basis of diversity jurisdiction. There is no dispute that the parties are completely diverse in citizenship. In their removal notice, defendants assert that the amount in controversy satisfies the jurisdictional threshold of $75,000 in three independent respects: (1) the un-recouped cost to drill and complete the well is $329,138.50; (2) the current market value of the leases is approximately

$210,000; and (3) the potential for future production from the well has a value in excess of $75,000. Plaintiffs have moved to remand the action to state court on the grounds that defendants' metrics have no bearing on the amount in controversy because they are not related to the relief requested by plaintiffs in their petition and, at least with respect to defendants' current market value and future production estimates, those estimates are entirely speculative.

As will be explained, the court denies plaintiffs' motion to remand because it cannot be determined to a legal certainty that the amount in controversy is less than $75,000.

*Applicable Standard*

Subject matter jurisdiction under 28 U.S.C. §1332(a) requires a diversity of citizenship between the parties and "an amount in controversy in excess of $75,000, exclusive of interest and costs." *McPhail v. Deere & Co.*, 529 F.3d 947, 952 (10th Cir. 2008) (quoting 28 U.S.C. § 1332(a)). As the proponent of federal jurisdiction here, defendants must prove, by a preponderance of the evidence, jurisdictional facts that make it "possible that $75,000" is "in play" and, at that point, defendants are entitled to stay in federal court unless it is "legally certain" that the controversy is worth less than the jurisdictional minimum. *Id.* at 954-55 ("If the amount is uncertain then there is potential controversy, which is to say that at least $75,000 in in controversy in the case."). In cases seeking declaratory relief, the amount in controversy "is measured by the value of the object of the litigation" and, more specifically, "the pecuniary effect an adverse declaration will have on either party to the lawsuit." *City of Moore v. Atchison, Topeka, & Santa Fe Ry. Co.*, 699 F.2d 507, 509 (10th Cir. 1983). In the specific context of a suit brought to quiet title, the Tenth Circuit has held that the amount in controversy

is "the value of the realty directly affected." *Sanchez v. Taylor*, 377 F.2d 733, 736 (10th Cir. 1967) (citing *A.C. McKoy, Inc. v. Schonwald*, 341 F.2d 737, 739 (10th Cir. 1965)).

*Cost of Drilling the Well*

Defendants, through the affidavit of Ijaz Rehman, defendants' controller, contend that if plaintiffs succeed in having defendants' leasehold interest terminated, then they will lose the ability to recoup their remaining investment of $329,138.50 expended to drill and complete the well. Plaintiffs contend that defendants' "sunk costs" associated with drilling the well are irrelevant to determining the value of the leasehold interest. The court agrees. Indeed, any damages sustained by defendants in the case of an adverse declaration are appropriately measured primarily by the well's production rather than the "sunk costs" of drilling the well which defendants would have incurred regardless of the well's production. In reaching this conclusion, the court is guided first by the Tenth Circuit's statement in *Sanchez* that the amount in controversy in a quiet title action is appropriately measured by the value of the property— which, of course, would not include costs incurred by drilling the well. *See id*.

The court is also persuaded by Judge White's concurring opinion in *Northup Properties, Inc. v. Chesapeake Appalachia, L.L.C.,* 567 F.3d 767 (6th Cir. 2009). In *Northup*, the plaintiff claimed that, for nearly forty years, no lessee, including the defendant, marketed either oil or gas from the leased property. *Id*. at 768. The plaintiff brought suit in Kentucky state court seeking a judgment declaring the lease null and void. *Id*. Chesapeake removed the case to federal court and the plaintiff filed a motion to remand, alleging that the case failed to satisfy the amount in controversy requirement. *Id*. at 769. In denying the motion to remand, the district court

considered the affidavit of Chesapeake's petroleum engineer, detailing the value of the lease, to determine that the case met the amount-in-controversy requirements. *Id.* at 769–71. The affidavit contained estimates regarding (1) future gas flow from natural gas, (2) the discounted present value of the well, (3) the value of the undeveloped acreage of the entire lease-hold, and (4) the initial cost of drilling the well. *Id.* at 769.

The Sixth Circuit affirmed, finding that, based on the affidavit of the petroleum engineer, the defendant satisfied the amount in controversy requirement. *Id.* In so holding, the Circuit noted that "accounting for mineral interests is not an exact science" and accepted Chesapeake's argument that the jurisdictional amount should be measured by weighing Chesapeake's "loss of its right to the natural gas contained under the 4,400 acres of land." *Id.* at 770. While the majority opinion did not address Chesapeake's cost of drilling the well, Judge White addressed that issue in his concurring opinion:

> I agree with Northup that the cost of drilling the well is irrelevant, except insofar as that cost affects the value of the leasehold interest. . . . The value of the leasehold interest would, I think, be reasonably based on the likelihood of recovering oil and gas, the value of the oil and gas that might be recovered, the timing of such recovery, the costs of recovery and sale, the expenses of delay, and any other factors normally considered by persons engaged in the enterprise of valuing such interests. Chesapeake's affidavit could have addressed these factors more clearly, but Northup's arguments against jurisdiction did not fatally undermine the affidavit, and under all the circumstances, I agree that Chesapeake established that more likely than not, the amount in controversy exceeds $75,000.

*Id.* at 775. As reflected in Judge White's concurrence, then, the value of the leasehold interest might be reasonably based on many factors—none of which includes the initial cost of drilling the well. The Eighth Circuit appears to be in accord. *See Usery v. Anadarko Petroleum Corp.*, 606 F.3d 1017, 1019 (8th Cir. 2010) (in a quiet title action concerning an oil and gas lease, the

4

"matter in controversy . . . is the market value of the disputed mineral interest, and that by definition is necessarily the same to both parties.").

Defendants contend that the Tenth circuit's decision in *City of Moore v. Atchison, Topeka, & Santa Fe Ry. Co.*, 699 F.2d 507 (10th Cir. 1983) is indistinguishable from the facts presented here and clearly supports the idea that "construction costs already invested in a property" are a proper consideration in ascertaining the amount in controversy. In *City of Moore*, the railroad owned property within the city limits of Moore, Oklahoma and it began constructing a switching yard, office and storage building on the property. *Id*. at 509. Although the city had zoned the property "Suburban Agricultural," the railroad began construction and applied for rezoning. *Id*. The City's zoning commission denied the application, but before the city council ruled on the matter the railroad withdrew its application on the grounds that it was exempt from the City's zoning ordinances by virtue of a state statute purporting to exempt railroads from local zoning ordinances. *Id.*

The City filed suit in state court, seeking a declaration that the statutory exemption for railroads was unconstitutional. *Id*. The railroad removed the case and the City's subsequent motion to remand asserted that the amount in controversy was inadequate. *Id*. The district court denied the motion to remand and later granted the railroad's motion for summary judgment. *Id*. On appeal, the City argued that the amount in controversy did not exceed the jurisdictional threshold because "it sought only a declaratory judgment to determine whether Santa Fe is subject to the city's zoning ordinances." *Id*. Using the "value of the object of the litigation" measurement, the Tenth Circuit affirmed the district court:

> Santa Fe appended the affidavits of one of its officers, which stated that if Santa Fe cannot use its switching yard and building it will lose more than $4,800,000 in construction costs already incurred. Since the city did not controvert that contention, the amount in controversy requirement is met.

*Id.* at 510.

The court is not persuaded that *City of Moore* has any bearing on the appropriate measure of the amount in controversy in the context of a quiet title action concerning an oil and gas lease. In *City of Moore*, the object of the litigation was the railroad's right to construct and use a switching yard on its own property such that construction costs incurred by the railroad that would be lost if it were unable to use the yard were an appropriate measure of the amount in controversy. Here, the parties have no dispute over the construction of the well itself and defendants have been able to use that well for some years. The dispute here concerns defendants' leasehold interest in the Depenbusch Gas Unit. The costs defendants incurred constructing the well many years ago has no bearing on the current value of the leasehold interest because if there is no further production able to be obtained those expenditures are unable to be recouped whether plaintiffs win or lose this lawsuit.

For the foregoing reasons, the court rejects defendants' argument that the jurisdictional threshold is met by the cost of drilling the well.

*Current Market Value*

Defendants next contend that the jurisdictional amount is satisfied because the current market value of the leases is approximately $210,000. In support of that contention, defendants have submitted the affidavit of Fred Hambright, who owns and operates an oil and gas leasing

6

agency that procures such leases throughout the state of Kansas. Mr. Hambright avers, based on his knowledge of the market, that the "average oil and gas lease prices for acreage in Kingman County, Kansas has ranged between $550/acre to $1200/acre," although he acknowledges that he was recently made aware of "a possible oil and gas lease being taken in Kingman County, Kansas for $425/acre." According to Mr. Hambright, "[t]hese prices are dependent on the location of the acreage being put under lease, with acreage located in areas of known historical production such as the Spivey Grabs Field garnering more per acre."[1] Mr. Rehman, defendants' controller, concludes from the information received by Mr. Hambright that the current market value of the Depenbusch Gas Unit is $210,000—a conclusion reached by multiplying the 240 acres by the average per acre price of $875/acre.

The court agrees with plaintiffs that defendants have failed to prove, by a preponderance of the evidence, facts from which a reasonable trier of fact could infer that the specific leasehold interest at issue here has a current market value of $210,000. Defendants' evidence is based solely on Kingman County averages without any consideration of the particulars of the Depenbusch Gas Unit. Indeed, defendants do not dispute that the market value of any given lease depends primarily (if not exclusively) on the specific location of the acreage in question. They contend, however, that because the Depenbusch Gas Unit lies within the Spivey Grabs Field—an area of known historical production according to Mr. Hambright—it is reasonable to place a market value of the Depenbusch Gas Unit of $210,000. But the fact that Spivey Grabs Field is an area of "known historical production" is not sufficient to prove that production on this particular tract is consistent with production in other areas of Spivey Grabs Field. *See*

---

[1] The Depenbusch Gas Unit lies within the Spivey Grabs Field.

*Usery v. Anadarko Petroleum Corp.*, 606 F.3d 1017, 1020 (8th Cir. 2010) (rejecting affidavit that assumed that well would be as productive as a well that was three miles from it, where the affidavit "offered no hint as to the likelihood that the well on the property in issue would be as productive as the one three miles away"). Defendants' evidence does not speak to whether the productivity on the tract at issue is consistent with productivity on other tracts in the Spivey Grabs Field and, indeed, the evidence suggests that production from the Depenbusch well has been significantly lower than what might be anticipated from tracts in the Spivey Grabs Field. This is a fatal gap in defendant's evidence and, without such evidence, no reasonable trier of fact could assign a market value of $210,000 to the Depenbusch Gas Unit based on county-wide average per acre lease prices.[2]

In the end, then, defendants' evidence concerning average per acre prices in Kingman County does not establish the value of the specific leasehold interest here. *See Garner v. XTO Energy, Inc.*, 2010 WL 3171475, at *2 (E.D. Ark. Aug. 6, 2010) (affidavit stating that each net mineral acre was worth at least $481.00 was insufficient to establish jurisdictional amount where the affidavit failed to consider pertinent factors impacting the value of the mineral rights at issue). Indeed, those courts that have found the amount-in-controversy requirement satisfied on the basis of the tract's fair market value have done so in light of evidence focused on the specific tract at issue. *See Occidental Chem. Corp. v. Bullard*, 995 F.2d 1046, 1047 (11th Cir. 1993)

---

[2]Plaintiffs suggest that the market value of the leasehold interest is $5708.00 based on a tax appraisal from the county appraiser for the 2012 tax year. The court rejects this evidence for two reasons. First, the exhibit submitted by plaintiffs simply does not contain the figures suggested by plaintiffs. It appears that plaintiffs have inadvertently submitted an incomplete version of the appraisal. Second, plaintiffs do not establish that the value of the leasehold interest set forth in the appraisal is equivalent to the fair market value of the leasehold interest.

(value of property established for amount-in-controversy purposes by evidence of property's fair market value; certified real estate appraiser opined as to property's fair market value); *Conley v. Whirlpool Corp.*, 2011 WL 797409, at *4 (E.D. Tenn. Mar. 1, 2011) (finding persuasive fair-market-value evidence specifically directed at the disputed property); *Perrin v. Tenneco Oil Co.*, 505 F. Supp. 23, 24-25 (W.D. Okla. 1980) (finding amount-in-controversy satisfied where evidence established current market value of specific leasehold interest). Even the sole case cited by defendants in support of their argument concerned fair-market-value evidence on the specific acreage covered by the lease. *See Thomas Well Serv., Inc. v. Williams Natural Gas Co.*, 1993 WL 393708, at *2 (D. Kan. Sept. 8, 1993).

*Future Production Potential*

Finally, defendants contend that the jurisdictional amount is satisfied based on future gas production activities which, according to defendants, will produce a future gross profit in excess of $75,000 over the lifetime of the well. In support of their argument, defendants have submitted the affidavit of Ronald T. Wefelmeyer, a consulting petroleum engineer for one of the defendants. Mr. Wefelmeyer avers that he has worked as a petroleum engineer in the oil and gas industry for more than 30 years and that he has focused his work on the design, completion, development, drilling and exploration of oil and gas operations in numerous geographical locations, including South Central Kansas. He avers that he is familiar with the production history of both the well on the Depenbusch Gas Unit and the Sprivey Grabs Field area.

According to Mr. Wefelmeyer, the first several years of production from the Depenbusch well were unstable in light of drainage from offsetting wells that initially impacted the reservoir

9

pressure in the Depenbusch Gas Unit. Mr. Wefelmeyer avers that because of those pressure problems, stimulation fluids could not flow back to the well and be recovered quickly; it took several years for enough stimulation fluid to be pumped out of the well to then facilitate gas in the reservoir to flow to the wellbore. Mr. Wefelmeyer avers that the well is now stable and has had stable production for the last two years. He opines that "it is reasonable to expect that gas production from the Depenbusch 1-26 well will follow established field trends of low pressure volumes and no decline for a long period of time, as other wells of similar type in the Spivey-Grabs Field that were drilled in the 1950s are still producing at steady rates." Based on defendants' evidence that the average annual gross profit from the well over the past six years is $1941.72, Mr. Wefelmeyer opines that it is within reason to assume that the well will produce a future gross profit in excess of $75,000 over its lifetime. Finally, Mr. Wefelmeyer avers that there is potential and appropriate spacing for new drilling possibilities on the Depenbusch Gas Unit.

Plaintiffs do not dispute Mr. Wefelmeyer's qualifications. Rather, plaintiffs contend that, contrary to Mr. Wefelmeyer's opinion, the well is not stable and is evidencing a continuing decline of shut-in pressure. Plaintiffs point to a one-point stabilized open flow/deliverability test that defendants performed on the well in August 2010 and September 2011 indicating a 31% decrease in wellhead pressure in just over a year's time. Plaintiffs also submit a "production plot and decline curve analysis" purporting to measure remaining reserves of the well at 0 MCF based upon the Kansas Geological Survey's computer generated analysis. Plaintiffs' evidence, however, does not fatally undermine defendants' evidence on the issue of future production potential.

In his rebuttal affidavit, Mr. Wefelmeyer explains that the one-point stabilized open/flow deliverability tests cannot be considered an accurate predictor of wellhead pressure or well stability because wellhead pressure can vary based on the presence of fluid or water in the well at the time the pressure test is conducted. According to Mr. Wefelmeyer, only bottom-hole pressure tests—which these tests are not—can accurately predict stability over time. Mr. Wefelmeyer also highlights that actual gas production from the well does not reflect a 31% decrease in wellhead pressure as production numbers declined by only 3% over the time period between the two one-point stabilized open flow/deliverability tests. With respect to the production plot and decline curve analysis, Mr. Wefelmeyer explains in his rebuttal affidavit that the decline curve analysis uses 4 MCF/day as an arbitrarily selected economic limit, which is higher than the current producing rate of the Depenbusch well.[3] The decline curve analysis, then, will necessarily not project a reserve for the Depenbusch well because the program used by plaintiffs to develop the decline curve analysis utilizes inherently flawed data.

The court is persuaded, then, for purposes of assessing the jurisdictional amount in controversy, that the Depenbusch well is relatively stable and plaintiffs have not sufficiently undermined defendants' evidence that the well will remain stable for many years. Indeed, plaintiffs have not otherwise controverted Mr. Wefelmeyer's opinion that it is reasonable to expect that the well will produce at the same levels for another 60 years or more. Moreover, although plaintiffs doubt the sincerity of defendants' desire to drill more wells on the Depenbusch Gas Unit, they do not dispute that certainly there is room for additional drilling on

---

[3] The evidence reflects that the Depenbusch well produced a total of 335 MCF in 2011 and a total of 348 MCF in 2010.

11

the property which could result in the production of gas in commercially viable quantities. *See Northup Props*., 567 F.3d at 771 ("a mineral lease is not 'worthless'—even in a tract where a sole well lies abandoned—as long as some possibility exists to drill other wells that 'might result in finding oil and gas in productive quantities," *quoting Davis v. C.I.R*., 241 F.2d 701, 703 (7th Cir. 1957)).

Plaintiffs' remaining challenge to defendants' evidence concerning future production potential is that the evidence measures that potential in terms of defendants' "gross profit" rather than net profit. Plaintiffs do not direct the court to any relevant authority requiring defendants to measure future production potential in terms of net profit and, as defendants highlight, at least one court has analyzed the value of a leasehold interest by considering future gross revenues. *See Thomas Well Serv., Inc. v. Williams Natural Gas Co*., 1993 WL 393708, at *2 (D. Kan. Sept. 8, 1993) (measuring fair market value of leasehold interest by potential gross earnings on the plaintiff's working interest in producing wells).[4] While plaintiffs contend that any measurement of future earnings necessarily must include information about expenses related to those earnings, there is no evidence in the record from which the court could conclude to a legal certainty that a consideration of expenses would take defendants' projections below the jurisdictional threshold. Moreover, Mr. Wefelmeyer's rebuttal affidavit indicates that

---

[4] Plaintiffs contend that Kansas courts look to net profits to determine whether a well is producing in paying quantities for purposes of analyzing the breach of an oil-and-gas lease habendum clause. *See Reese Enterprises, Inc. v. Lawson*, 220 Kan. 300, 314 (1976) ("To avoid termination of the lease we start with the proposition that the lessee must operate the lease to produce those quantities of oil or gas which will produce a profit, however small, over operating expenses . . . . "). While that standard may apply to the merits of plaintiffs' claims, the court is not persuaded that it applies for purposes of analyzing the amount in controversy at the removal stage.

defendants' revenue projections are conservative as they do not take into account additional revenue received from the separate sales of residue gas and natural gas liquids after processing and he reaffirms his opinion that defendants have an opportunity "to produce a profit from the continued production and operation of the Depenbusch Gas Unit in excess of $75,000."

Defendants, then, have sufficiently proved by a preponderance of the evidence that a reasonable, conservative estimate of future cash flows from the Depenbusch Gas Unit is roughly $120,000 (calculated by multiplying annual gross profits of $2000 over a 60-year lifetime).[5] Moreover, plaintiffs are undisputedly seeking monetary damages for their trespass, conversion and breach of contract claims. Thus, because it cannot be determined to a legal certainty that the amount in controversy is less than $75,000, the court denies plaintiffs' motion to remand.

**IT IS THEREFORE ORDERED BY THE COURT THAT** plaintiffs' motion to remand (doc. 11) is denied.

**IT IS SO ORDERED.**

Dated this 29th day of January, 2013, at Kansas City, Kansas.

---

[5] Although plaintiffs do not raise the issue, the court notes that there is no evidence in the record of the present value of defendants' projected future cash flows. *See Usery v. Anadarko Petroleum Corp.*, 606 F.3d 1017, 1019 (8th Cir. 2010) (matter in controversy is the present market value of the disputed mineral interest). Nonetheless, defendants' evidence is sufficient to permit the conclusion that the present value of the leasehold interest (using current United States Treasury bill rates of return) could be in excess of $75,000.

s/ John W. Lungstrum
John W. Lungstrum
United States District Judge